859 So.2d 1213 (2003)
Roger C. BENSON and Patricia Hardy-Smith, individually and as Co-Personal Representatives of the Estate of Noah Benjamin Benson, a minor, Appellants,
v.
NORWEGIAN CRUISE LINE LIMITED, and Carla Von Benecke, M.D., Appellees.
No. 3D01-1845.
District Court of Appeal of Florida, Third District.
November 5, 2003.
*1214 Colson Hicks Eidson and Marc Cooper and Maureen E. Lefebvre, Coral Gables, for appellants.
Mase & Gassenheimer and Beverly D. Eisenstadt and Jeffrey E. Foreman, for appellees.
Before COPE, GERSTEN and FLETCHER, JJ.

On Motion for Rehearing and Certification
COPE, J.
On consideration of the appellees' motion for rehearing, rehearing en banc, and certification, the court withdraws its opinion dated January 15, 2003 and substitutes the following opinion:
The plaintiffs in this case brought a lawsuit alleging medical malpractice aboard a cruise ship, at a time when the ship was 11.7 nautical miles east of the Florida shore. The question presented is whether the medical malpractice incident occurred within Florida's territorial waters. We conclude that the answer is yes.

I.
The decedent, Noah Benson, was a thirteen-year-old passenger on the M/S Leeward, a cruise ship owned by defendant-appellee Norwegian Cruise Line Limited ("NCL"). Noah was traveling with his mother, plaintiff-appellant Patricia Hardy-Smith, as well as another family member. The cruise route was from Miami to Key West and return.
While on board, Noah ate shellfish and had an allergic reaction. Due to swelling in the windpipe he could not breathe.
Medical treatment was sought from the ship's doctor, appellee Carla Von Benecke. She attempted to insert a breathing tube several times. Noah died before intubation could be successfully completed.
The mother and Roger C. Benson, the natural father, brought a wrongful death action against NCL and Dr. Von Benecke, claiming medical malpractice. Dr. Von *1215 Benecke moved to dismiss for lack of personal jurisdiction. Dr. Von Benecke is a South African national who was employed on the NCL cruise ship as a contract employee.
The plaintiffs opposed Dr. Von Benecke's motion to dismiss, arguing that the claimed incident of medical malpractice occurred while the ship was within Florida's territorial waters as defined by article II, section 1, of the Florida Constitution. The trial court concluded that the ship was outside of Florida's territorial waters at the relevant times and granted the motion to dismiss as to Dr. Von Benecke. The plaintiffs have appealed.[1]

II.
Dr. Von Benecke is not a resident of Florida. However, under Florida's long arm statute, a Florida court may exercise personal jurisdiction over a nonresident where (insofar as pertinent here) the cause of action arises from the defendant's "[c]ommitting a tortious act within this state." § 48.193(1)(b), Fla. Stat. (1997).[2] Thus if the medical treatment giving rise to the present case occurred within Florida's territorial boundaries, this is sufficient to establish long arm jurisdiction over Dr. Von Benecke. Godfrey v. Neumann, 373 So.2d 920 (Fla.1979).
We turn then to a consideration of Florida's boundaries. These are set forth in article II, section 1, of the 1968 Florida Constitution.
The eastern part of the boundary between Florida and Georgia is the St. Marys River. Where that river enters the Atlantic Ocean, the Florida boundary proceeds "due east to the edge of the Gulf Stream or a distance of three geographic miles whichever is the greater distance; thence in a southerly direction along the edge of the Gulf Stream or along a line three geographic miles from the Atlantic coastline ... whichever is greater, to and through the Straits of Florida...." Fla. Const. Art. II, § 1 (1968) (emphasis added).[3]
According to the expert evidence in this case, the cruise ship was at all relevant times within this boundary. The ship was located 11.7 nautical miles east of Florida's coastline. The ship had not yet reached the edge of the Gulf Stream, which was 14 nautical miles east of the relevant portion of Florida's coastline on the day in question. Thus, based on the boundary as stated in the Florida Constitution, the claimed incident of medical malpractice occurred within Florida's territorial boundaries.[4]

*1216 III.
Dr. Von Benecke argues that under the federal Submerged Lands Act, Florida is not allowed to claim an Atlantic territorial sea greater than three nautical miles. That is not so.
The Submerged Lands Act was adopted in order to resolve a controversy between the states and the federal government regarding ownership of the ocean bed and the natural resources contained therein. See United States v. States of Louisiana, Texas, Mississippi, Alabama and Florida, 363 U.S. 1, 4-36, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960) (hereafter "United States v. Louisiana"). For that purpose, the Act provided in general terms for a three-mile seaward boundary for coastal states wherein the states would own and control the sea bed and its resources. 43 U.S.C. §§ 1311, 1312.[5] The present case does not involve any claim of ownership of the ocean bed or the resources contained therein.
As we view the matter, the Submerged Lands Act does not prevent Florida from asserting a territorial sea beyond three miles in the Atlantic, and exercising police powers thereon. See Carnasion v. Paul, 53 So.2d 304 (Fla.1951); see also Tidewater Marine Western, Inc. v. Bradshaw, 14 Cal.4th 557, 59 Cal.Rptr.2d 186, 927 P.2d 296 (1996). The conduct at issue here occurred on the ocean's surface, not on the ocean bottom.
Dr. Von Benecke contends that under international law it is impermissible for Florida to claim a territorial sea in excess of twelve miles. She points out that the United Nations Convention on the Law of the Sea states, in part, "Every State has the right to establish the breadth of its territorial sea up to a limit not exceeding 12 nautical miles, measured from baselines determined in accordance with this Convention." Id. Part II, § 2, Art. 3. The parties agree that the United States is not a signatory to the Convention, but Dr. Von Benecke points to the existence of the Convention as being evidence of international law on the point. We need not address that argument here. The claimed incident of malpractice occurred when the cruise ship was less than twelve nautical miles offshore.
Dr. Von Benecke argues that our decision is contrary to the Death on the High Seas Act, 46 U.S.C.A. app. § 761-67. That argument is incorrect. The Death on the High Seas Act does not purport to define the territorial boundaries of the various states.
Dr. Von Benecke argues that it is impermissible to establish a territorial sea boundary as being the western edge of the Gulf Stream, because the Gulf Stream moves, thus creating a variable boundary. That is not a proper ground for objection here. The Florida Constitution already establishes the boundary as the edge of *1217 the Gulf Stream, and the wisdom of that decision was for the drafters of the Constitution and the electorate in ratifying it. The boundary must be respected unless overridden by controlling federal law or treaty.

IV.
Dr. Von Benecke asserts that the plaintiffs' position in this case is inconsistent with Darbie v. State, 711 So.2d 1280 (Fla. 3d DCA 1998), but that is not so. The Darbie decision construed a different Florida constitutional provision, article X, section 16, which contains its own boundary definition for enforcing the ban on marine net fishing. Darbie has no application here.
Dr. Von Benecke argues that under Elmlund v. Mottershead, 750 So.2d 736 (Fla. 3d DCA 2000), Florida's territorial limit has been set at three miles. That is not so. In Elmlund the opinion states that the alleged medical malpractice occurred on the high seas, but the opinion does not address Article II, Section 1 or the location of Florida's territorial sea.[6]National Ins. Co., 686 So.2d 711 (Fla. 3d DCA 1997), this court stated that "[t]he water seaward of the coastline and out to the three-mile limit is the marginal or territorial sea of Florida." Id. at 714. The actual issue in that case, however, was the definition of "inland waters" for purposes of an insurance policy and we ruled that "[t]he marginal or territorial sea is not `inland waters.'" Id. The interpretation of Article II, Section 1, was not raised or decided in that case. "[N]o decision is authority on any question not raised and considered, although it may be involved in the facts of the case." State ex rel. Helseth v. Du Bose, 99 Fla. 812, 128 So. 4, 6 (1930); Goldman v. State Farm Fire Gen. Ins. Co., 660 So.2d 300, 304 (Fla. 4th DCA 1995); City of Miami v. Stegemann, 158 So.2d 583, 584 (Fla. 3d DCA 1963).
Dr. Von Benecke argues that the decision in New Sea Escape Cruises, Ltd. v. Florida Dept. of Revenue, 823 So.2d 161 (Fla. 4th DCA 2002), rev. granted, 845 So.2d 889 (Fla.2003), establishes three miles as the limit of Florida's territorial sea in the Atlantic Ocean. See id. at 163 (referring to "the three-mile limit"). She also cites Butterworth v. Tropic Casino Cruises, Inc., 796 So.2d 1283 (Fla. 5th *1218 DCA 2001), which likewise refers to "the three-mile boundary of the State of Florida." Id. at 1284. Again, neither of these cases decided the point now before us. In neither case was the effect of Article II, Section 1, of the Florida Constitution addressed.
For the stated reasons, we reverse the judgment dismissing Dr. Von Benecke from the lawsuit, and remand for further proceedings.
Reversed and remanded.[7]
NOTES
[1] The lawsuit remains pending in the trial court with respect to NCL.
[2] The date of death was February 27, 1998. See Fibreboard Corp. v. Kerness, 625 So.2d 457, 459 (Fla.1993) ("The statute in effect at the time of the acts subjecting one to long-arm jurisdiction is the applicable one.")
[3] The plaintiffs mistakenly state that this boundary definition originated with the Florida Constitution of 1868. The plaintiffs' error is traceable to a misquote in an unpublished federal decision, in which the court inadvertently described the just-quoted language as being found in the Florida Constitution of 1868, rather than 1968. See Shultz v. Florida Keys Dive Center, Inc., No. 97-10047-Civ., Order on Defendants' Motions for Summary Judgment, at 33-34 (S.D.Fla. July 24, 1998).

Florida's constitutional descriptions of the eastern boundary have varied in each constitution from 1868 to the present. See Fla. Const. Art. I (1868); Fla. Const. Art. I (1885); Id. (as amended 1962); Fla. Const. Art. II, § 1 (1968).
[4] The plaintiffs offer an alternative analysis which we need not reach. The plaintiffs point out that the final sentence of Article II, Section 1 provides, "The State of Florida shall also include any additional territory within the United States adjacent to the Peninsula of Florida lying south of the St. Marys River, east of the Perdido River, and south of the States of Alabama and Georgia."

The United States has adopted a territorial sea of twelve nautical miles. Proclamation No. 5928, 54 Fed.Reg. 777 (Dec. 27, 1988). The plaintiffs assert that under this part of the Florida constitutional provision, Florida has a twelve-mile territorial sea, coterminous with the twelve nautical miles described in Proclamation No. 5928.
[5] The Act provided a procedure for a state to claim a greater boundary "if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress." Id. § 1312. In United States v. Louisiana, Florida successfully established a historic boundary within the Gulf of Mexico of three marine leagues, and thus became entitled under the Act to ownership of that submerged land. 363 U.S. at 121-29, 80 S.Ct. 961.
[6] Speaking just for himself, the writer of this opinion suggests that in an appropriate case, this court should recede from its decision in Elmlund v. Mottershead, 750 So.2d 736 (Fla. 3d DCA 2000). In that case, a medical malpractice claim was asserted against a ship's physician who was employed on a cruise liner based in Miami. The alleged incident of malpractice occurred on the high seas. Because the alleged incident of malpractice occurred outside of Florida's territorial waters, the Elmlund court concluded that the doctor could not be deemed to have been doing business in Florida. Id.; see also Rana v. Flynn, 823 So.2d 302 (Fla. 3d DCA 2002).

The Elmlund panel took much too narrow a view. Where a Florida-based company is in the business of selling cruises which depart from Florida, sail into international waters, and return to Florida, plainly the company is engaged in business in Florida. The same analysis holds true for a ship's physician who, under a contract of employment, sails on such a ship. See § 48.193(1)(a), Fla. Stat. See generally Tidewater Marine, 59 Cal.Rptr.2d 186, 927 P.2d at 300-01.
Because of Elmlund, it has been necessary for the parties in the present case to devote considerable time and resources to establishing the exact location of the ship, so as to determine whether the alleged tort occurred within Florida's boundaries. Such an inquiry should not be necessary, because entering into an employment agreement to serve as the ship's doctor on a cruise liner operating out of Miami clearly amounts to engaging in business in Florida for purposes of the long arm statute.
[7] In light of this opinion, the motion for rehearing and certification of a question of great public importance is denied.